**Katherine JEFFRIES, on behalf of herself and all others similarly situated, Plaintiff,**

**v.**

**GEORGIA RESIDENTIAL FINANCE AUTHORITY et al., Defendants.**

**Civ. A. No. C79–1349.**

United States District Court, N. D. Georgia, Atlanta Division.

Dec. 22, 1980.

Martha A. Miller and Robert W. Cullen, Augusta, Ga., Elisabeth Youngerman, Savannah, Ga., John L. Cromartie, Jr., Atlanta, Ga., for plaintiff.

Arthur K. Bolton, Atty. Gen., Ethel D. Andersen, Asst. Atty. Gen., William L. Harper, U. S. Atty., Curtis E. Anderson, Asst. U. S. Atty., Atlanta, Ga., Jeffrey Starnes, Nation, Maddox & Starnes, Conyers, Ga., for defendants.

## ORDER

ROBERT H. HALL, District Judge.

Plaintiffs, who are hereby certified as a class defined in the court's order of January 28, 1980, are or have been tenants inhabiting homes the rent for which is partially paid with federal rent subsidies. The Section 8 Existing Housing Assistance Payments Program, which supplies the rent subsidies, was established by Congress through enactment of Section 8 of the Housing and Community Development Act of 1974. 42 U.S.C. § 1437f. The program is implemented by regulations found at 24 C.F.R. Part 882.

Eligible participants receive a certificate of family participation, 24 C.F.R. § 882.12, which permits low income families to participate in the Section 8 program. Once certified, the family must locate a privately owned dwelling that complies with the housing quality standards approved by the

Department of Housing and Urban Development (HUD). 24 C.F.R. §§ 882.103(a) and 882.109. When a certificate holder locates a dwelling he submits a request for lease approval. After approval, the Section 8 Existing Housing Assistance Program participant executes a lease with the owner of the private dwelling. The local Public Housing Agency (PHA), which in this case is the Georgia Residential Finance Authority (GRFA), simultaneously or subsequently executes a Housing Assistance Payment Contract with the owner. The assistance contract provides that assistance payments may be paid only with respect to a dwelling unit under lease for occupancy by a family determined to be a lower income family at the time the family initially occupies the dwelling. The Housing Assistance Payment Contract addresses contract rent, the family portion of the rent, assistance payments, maintenance, operations, inspections, and evictions among other provisions.

A certified family with a lease pays between 15 and 25 percent of its adjusted income for rent and utilities as determined in accordance with 42 U.S.C. § 1437f(c)(3) and 24 C.F.R. § 889.105. The balance of the rent is paid by GRFA directly to the owner on behalf of the certified family. The lease entered into by the participant must be approved by GRFA and must conform to regulations in order for payments to be made to the owner.

Each lease under the program is also affected by 42 U.S.C. § 1437f(d)(2), which requires each contract for an existing dwelling to be for not less than one month nor more than 180 months. All GRFA leases are for terms of 12, 24, or 36 months, but each lease contains a clause that allows termination upon 30 days written notice by either the landlord or the tenant at will.

Because of the clause allowing termination at will, the program as it now operates in Georgia does not require good cause prior to lease termination and thus provides no basis on which a tenant may contest termination of his lease. The issue in the present case is whether, under the statute, a lease may be terminated without good cause.

Evictions of Section 8 existing housing tenants are covered by 24 C.F.R. § 882.215, the only HUD regulation on the subject, which provides:

The Owner shall not evict any Family unless the Owner complies with the requirements of local law, if any, and of this section. The Owner shall give the Family a written notice of the proposed eviction, stating the grounds and advising the Family that it has 10 days (or such greater number, if any, that may be required by local law) within which to respond to the Owner. The Owner must obtain the PHA's authorization for an eviction; accordingly, a copy of the notice shall be furnished simultaneously to the PHA, and the notice shall also state that the Family may, within the same period, present its objections to the PHA in writing or in person. The PHA shall forthwith examine the grounds for eviction and shall authorize the eviction unless it finds the grounds to be insufficient under the Lease. The PHA shall notify the Owner and the Family of its determination within 20 days of the date of the notice to the Family, whether or not the Family has presented objections to the PHA. If the Owner has not received a response from the PHA within 20 days, he shall telephone the PHA and shall be informed by the PHA whether a notice of determination has been mailed. If the PHA informs the Owner that no notice has been mailed within the 20 day period, the PHA shall be deemed to have authorized the eviction.

Congress has provided, however, that assistance payments contracts between a PHA and an owner of existing housing must provide that "the agency shall have the sole right to give notice to vacate, with the owner having the right to make representation to the agency for termination of tenancy." 42 U.S.C. § 1437f(d)(1)(B). Thus, the statute and the regulation are in apparent conflict.

The statutory provision regarding eviction for existing housing tenants is in contrast to that provided in the Section 8 programs for new or substantially rehabilitat-

ed housing. In the latter two Section 8 programs the "contract between the Secretary and the owner ... shall provide that all ownership, management, and maintenance responsibilities, including the selection of tenants and the termination of tenancy, shall be assumed by the owner (or any entity, including a public housing agency, approved by the Secretary, with which the owner may contract for the performance of such responsibilities)." 42 U.S.C. § 1437f(e)(2).

All of the plaintiffs have been certified by GRFA as eligible to participate in the Section 8 Existing Housing Assistance Payments Program and were eligible when their leases were terminated or when they received termination notices from their landlord. Each plaintiff entered into a lease with the Midtown Apartments in Conyers, Georgia, for a term of 12 months, but each lease contained a provision allowing either the landlord or the tenant to terminate the lease upon the giving of 30 days notice. Pursuant to the 30-day termination clause, defendant Taptich, the owner of Midtown Apartments, gave notice to plaintiffs that he intended to terminate their leases and simultaneously informed GRFA. GRFA provided no administrative hearing or other relief with respect to the proposed terminations involved in the case. The present litigation ensued.

The essence of plaintiffs' claim is that their due process rights have been violated by the termination procedure involved in GRFA's administration of the Section 8 Existing Housing Program. To evaluate the merits of plaintiffs' contentions properly, the court must systematically address whether or not there has been sufficient state action in this case to implicate the due process clause of the fourteenth amendment, whether or not plaintiffs have a property right in the continued occupancy of their apartments during the terms of their respective leases absent good cause for termination despite the lease provision permitting termination at will, and if so, what processes are required by the Constitution to protect that property right. Therefore, the court will examine each issue separately and sequentially.

## I. STATE ACTION

The constitutional prohibition against deprivations of property without due process of law applies only to government action. U.S.Const. Amend. XIV. Identical deprivations by private parties are without constitutional implication. Therefore, as a threshold proposition, the court must conclude that there is some form of governmental action before analyzing the substantive property right involved, if any, and the procedural protections available. If there is insufficient governmental involvement in the Section 8 Existing Housing Program, the court's analysis need proceed no further.

Where the hand of government is clear, and its path toward contact with the individual unobstructed, the question of state action is easily resolved. Where, however, the hand of government is clear, but its path toward contact with the individual clouded by the action of a private individual, the question of state action is troublesome and fact-specific. "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance." *Burton v. Willmington Parking Authority*, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961).

*Burton v. Willmington Parking Authority* is the controlling case on the issue of state action. In *Burton*, the state of Delaware had leased, through a political subdivision of the state, space in a parking garage to the Eagle Coffee Shoppe, a restaurant that refused to serve blacks. The restaurant was owned and operated solely by private individuals and, other than being located in a public parking garage, had no abnormal contacts with state government. After analyzing the specific facts of the case, including the financing of the garage and benefits conferred by the restaurant and the garage on each other, the Court concluded that the state had "so far insinuated itself into a position of interdependence with Eagle that it must be recognized as a joint participant in the challenged activity, which, on that account, cannot be considered to have been so 'purely private' as to fall without the scope of the Fourteenth

Amendment." *Id.* at 725, 81 S.Ct. at 862. If, then, GRFA has so far insinuated itself with the private owner in carrying out the challenged eviction procedure, the evictions involved in this case cannot be considered to be purely private and without constitutional importance.

There is unquestionably an important involvement by private landlords in the Section 8 Existing Housing Program as it is administered by GRFA and as it was envisioned by Congress. The government, of course, is intimately involved with the program, but intimate involvement, even significant regulation, will not necessarily result in state action without a close nexus between the state and the eviction of the Section 8 tenant. *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974). The court finds that such a nexus exists.

The involvement of the federal government is extensive, but when the hand of the federal government acts in the Section 8 program it reaches no further than the PHA. This is consistent with the congressional intent "that primary responsibility for carrying out the leasing program should be vested in public housing agencies." S.Rep. No. 693, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. and Ad. News 4273, 4314. The Section 8 owner, however, has significant responsibilities for the management of his property. Nevertheless, the nexus between the state and the particular action in question in this case, lease termination and tenant eviction, is both firm and close.

■ The responsibility of the state for lease termination and eviction is undeniable. The statute explicitly provides that "the agency shall have the sole right to give notice to vacate, with the owner having the right to make representation to the agency for termination of tenancy." 42 U.S.C. § 1437f(d)(1)(B). The PHA involved here, Georgia Residential Finance Authority, is statutorily created and is an instrumentality of state government. Ga.Code Ann. § 99–3604. With respect, then, to tenancy termination and eviction, the state action is apparent. Whether or not the agency is actually issuing notices to vacate, as required by statute, its involvement in the eviction process is unequivocal. Should it fail to issue the statutorily required notice to vacate, its failure is no less a logical action than its actual issuance of a notice to vacate. HUD regulations confirm that failure of the state PHA to act is to be viewed as an action and is deemed an authorization of the eviction. 24 C.F.R. § 882.215. Since failure of the state to act is regarded as an affirmative authorization of eviction under the program as administered, the administrative authorization of inaction no less constitutes an action than an actual authorization of eviction. Klein & Schrider, *Procedural Due Process and the Section 8 Leased Housing Program,* 66 Ky.L.J. 303, 335 (1977).

Aside from the direct involvement of GRFA in the evictions of plaintiffs, there is a nexus between the state and the Section 8 owner sufficient to constitute state action under *Burton.* It is important to note that GRFA screens the prospective tenants, 24 C.F.R. § 882.116(c), and reviews the lease between the Section 8 owner and the Section 8 tenant, 24 C.F.R. § 882.116(j), as well as authorizes evictions. 24 C.F.R. § 882.116(p). In addition, GRFA is in a direct contractual relationship with the Section 8 owner, 42 U.S.C. § 1437f(b)(1), who benefits both from the rent subsidy payments directly and from the assurance that those payments will continue under some circumstances despite vacancy. 24 C.F.R. § 882.105(b). The benefits of this contractual relationship flow to the state as well. The Section 8 owner provides housing for those state citizens who, by definition, could not afford a decent place to live without assistance. This privity of contract and conferring of mutual benefits results in a concert of action sufficient to be designated state action under *Burton.*

The court has discovered one similar case involving a state action question much like the one here. *Flamm v. Real-Blt, Inc.,* 168 Mont. 351, 543 P.2d 190 (1975), *cert. denied,* 425 U.S. 941, 96 S.Ct. 1678, 48 L.Ed.2d 184 (1976). In that case, the Supreme Court of Montana found that an eviction by a private landlord receiving federal benefits in

the form of mortgage insurance and rent subsidies administered by the Federal Housing Administration was not state action and did not implicate the due process clause. The lease involved in that case contained a 30-day termination clause as do the leases involved in the present litigation. The Supreme Court of Montana, of course, is not binding on this court, nor is its opinion here persuasive. Even if it were, however, the present case is distinguishable since state action is explicitly required by the federal statute to effect an eviction of a Section 8 tenant. This direct involvement by the state allows the court to avoid a complex search for some hypothetical nexus or intertwining relationship between the state and the private party who has actually acted.

*Flamm* was reviewed, albeit in a cursory fashion, on plaintiff's application for a stay of the Montana court's decision. *Flamm v. Real-Blt, Inc.*, 424 U.S. 1313, 96 S.Ct. 941, 47 L.Ed.2d 77 (Rehnquist, Circuit Justice, 1976). Justice Rehnquist denied the stay on the basis that the full Court would not grant certiorari because the 30-day termination clause that appeared in the lease would make it unnecessary to reach the state action issue. Upon careful consideration, this court does not believe its decision should be greatly affected by Justice Rehnquist's opinion in *Flamm*. Since plaintiffs assert that the 30-day clause violates the federal statute that creates the program involved here, the court cannot avoid the constitutional issue and the preliminary state action issue as could Justice Rehnquist.

This court must conclude, therefore, that there is state action in this case. This conclusion is supported by an earlier line of cases in which state action was found to exist where private landlords acted in government subsidized housing programs administered by the Federal Housing Administration. *See, e. g., Joy v. Daniels*, 479 F.2d 1236 (4th Cir. 1973). The court cannot distinguish the *Joy* line of cases as having any less government involvement than the present case. In fact, the court cannot see that the state's involvement in evictions under the Section 8 Existing Housing Program could be any greater.

## II. THE SUBSTANTIVE PROPERTY INTEREST

Having determinated that state action is involved in this case, the court must determine whether or not plaintiffs have a property interest in Section 8 Existing Housing Program leases that cannot be terminated without cause prior to the end of the lease despite the current lease clause that permits termination at will. Such a property interest in a government benefit would certainly be nontraditional, but the concept of property is not static. The Supreme Court has provided an analysis for determining whether or not a particular interest, though nontraditional, may be deemed a property interest subject to the protections of due process.

To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it. It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined. It is a purpose of the constitutional right to a hearing to provide an opportunity for a person to vindicate those claims.

*Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 2704, 33 L.Ed.2d 548 (1972). Unless plaintiffs' interest is founded on such an objective basis or legitimate expectation, though it be interferred with by the state, it is not protected by the due process clause.

In *Roth*, the Supreme Court examined the system by which a state university chose to hire or rehire nontenured teachers. The Court found that under state law the decision whether to rehire a nontenured teacher for another year was left to the unfettered discretion of university officials. Therefore, the Court concluded that there was no legitimate expectation of being rehired. Consequently, the Court failed to find a property interest in *Roth* because there was no more than an abstract need or unilateral expectation of the government benefit at issue.

On the other hand, the Court demonstrated in *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) that a property right in a government benefit may arise implicitly. In other words, an explicit recognition of a property right in a government benefit by positive law is not necessary in order for an interest to be greater than an abstract need or unilateral expectation. Various sources may provide the objectivity necessary to classify an interest as a legitimate expectation and therefore a property interest protected by the due process clause.

The parties have made much of a recent case, *O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980), as bearing on the question of whether an individual's interest in remaining in a particular dwelling unit the cost of which is subsidized by federal funds constitutes a legitimate expectation or property right. *O'Bannon* addressed the issue of whether certain elderly residents of a nursing home have a constitutional right to a hearing before a state or federal agency may revoke the home's authority to provide them with care thus requiring the residents to move. The Court held that though such a revocation may be harmful to the residents, the residents have no constitutional right to participate in the revocation proceedings. *O'Bannon* is a case in which third parties affected by government action against another seek to intervene in that action, and would govern the present case if our facts involved private Section 8 tenants seeking to intervene in proceedings brought by HUD or GRFA to revoke the eligibility of a Section 8 landlord to receive housing assistance payments. Our case, however, involves government action directly against the party involved in the pending litigation. *O'Bannon* does not, therefore, require this court to find that plaintiffs lack a property interest.

■ Rather, the reasoning expressed in *O'Bannon* would lead one to conclude that the Supreme Court would unanimously find a property interest held by plaintiffs in the present case. All members of the Court agree on the general due process maxim that when a government benefit may only be withdrawn for cause, a legitimate expectation, entitlement, or property interest arises. *Memphis Light, Gas & Water Division v. Craft*, 436 U.S. 1, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978); *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975); *Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974); *Glenn v. Newman*, 614 F.2d 467 (5th Cir. 1980). If the present case fits within the maxim, due process rights attach to protect a tenant's legitimate expectation. Therefore, the court's task is to determine whether or not a Section 8 tenancy may be terminated during midterm only for cause under the federal statute creating the Section 8 Program.

■ The right to termination of a government benefit only for cause, of course, does not arise from the Constitution itself, *Goss v. Lopez*, 419 U.S. 565, 573, 95 S.Ct. 729, 735, 42 L.Ed.2d 725 (1975), but such rights may be statutorily created. *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Though it is a close question, the court concludes that the statute, regulations, and lease, taken together, yield a legitimate expectation that one will not be evicted from his home inhabited under a Section 8 existing housing lease without good cause.

The primary source of this expectation is the statute creating the Section 8 program itself. 42 U.S.C. § 1437f. The key provisions of the statute are subsections (d)(1)(A) and (B), which state:

(d)(1) Contracts to make assistance payments entered into by a public housing agency with an owner of existing housing units shall provide (with respect to any unit) that—

(A) the selection of tenants for such unit shall be the function of the owner, subject to the provisions of the annual contributions contract between the Secretary and the agency;

(B) the agency shall have the sole right to give notice to vacate, with the owner having the right to make representation to the agency for termination of tenancy.

When these subsections are read in conjunction, they implicitly guarantee that the local public housing agency, here GRFA, has absolute authority in terminating tenancies and authorizing evictions.

Such authority would be meaningless were GRFA not to exercise some review. If Congress had not intended that the PHA actually review the cause for a Section 8 owner's desire to terminate a tenancy, it presumably would not have required a meaningless formality by providing that only the agency shall have the right to give a notice to vacate. Furthermore, the Section 8 owner may only "make representation to the agency for termination of tenancy." The court interprets this language to mean that good cause is required before termination, and the Section 8 owner may only make representation to the agency that good cause for lease termination exists. If termination at will by the owner had been contemplated by the statute, there would have been no need to require the owner to make representation to the agency and to require the agency to bear the burden of issuing notices to vacate. If good cause were not required to terminate the tenancy, the owner would have nothing to make a representation about.

The structure of the legislation as enacted by Congress supports this conclusion. In addition to the existing housing program, there are two other Section 8 programs. Congress explicitly provides that in both of the other programs "all ownership, management, and maintenance responsibilities, including the selection of tenants and the *termination of tenancy*, shall be assumed by the owner." 42 U.S.C. § 1437f(e)(2) (emphasis added). Congress, then, has created three similar programs. In two of them, the private owner has explicit authority to terminate tenancies. In the other, only the PHA has the right to give notice to vacate and the private owner may do no more than seek the termination of the tenancy. The court does not believe that Congress explicitly provided for termination of tenancy by owners in the new or substantially rehabilitated housing programs and, by providing that the agency should have the sole right

to give notice, intended the same result in the existing housing program. Therefore, the court concludes that Congress implicitly required that PHAs review an owner's representations for termination of tenancy for good cause and issue notices to vacate only when good cause is found.

Furthermore, Congress only provided that the PHA take an active involvement in the midterm termination of leases. PHA involvement is not required when a landlord-tenant relationship is formed. The PHA is charged with certain administrative duties such as approving the lease, 24 C.F.R. § 882.116(j), but "the selection of tenants ... shall be the function of the owner." 42 U.S.C. § 1437f(d)(1)(A). Nor is government action required by the statute should a Section 8 landlord desire to end the landlord-tenant relationship when the term of a lease has run. Thus, defendants' statutory interpretation that Congress intended the Section 8 program to operate in the same manner as a totally private landlord-tenant relationship finds expression in the legislative scheme. But the fact that Congress omitted PHA involvement from the formation and termination of the landlord-tenant relationship at the natural beginning and end of the lease forming the basis for that relationship and included PHA involvement in the unnatural termination of the landlord-tenant relationship strengthens the conclusion that some reason or good cause must exist to prematurely terminate a Section 8 landlord-tenant relationship. This implicit congressional intention, embodied in the statutory language, is sufficient in the court's view to create a legitimate expectation that falls within the purview of due process protections.

The court's conclusion is strengthened by the general policy of the Section 8 program. According to the statute, the program is for "the purpose of aiding lower-income families in obtaining a decent place to live and of promoting economically mixed housing." 42 U.S.C. § 1437f(a). Arbitrary evictions upon the giving of 30 days notice would subvert this goal by interfering with the objective to aid low income families in obtaining a decent place to live with any

security and by interfering with the policy of promoting economically mixed housing with any stability. Klein & Schrider, *supra* at 344. "It is apparent, from the statutory language and the regulations promulgated to effect the Act, that the purpose of the Act is to enable poor and elderly persons ... to take full advantage of housing assistance offered by the federal government." *Brezina v. Dowdall*, 472 F.Supp. 82, 85 (W.D.Ill.1979). Arbitrary evictions hardly foster the goal of allowing citizens to take full advantage of federal rent subsidies.

The stated purpose of the Section 8 program is not unlike the stated purposes of conventional government housing projects or other federal rent subsidy programs provided for low-income residents of private housing. Among the implied purposes of the Section 8 program, as in other federal housing programs, is the purpose to assure an atmosphere of stability, security, neighborliness, and social justice. *Joy*, 479 F.2d at 1240. Arbitrary evictions contradict the goal of social justice, foster an atmosphere of hostility, and contribute to feelings of anomie and alienation. Note, *Procedural Due Process in Government-Subsidized Housing*, 86 Harv.L.Rev. 880 (1973). This policy analysis supports the conclusion that the expectation of plaintiffs is more than merely unilateral.

Since contracts between a PHA and an owner under the statute may be for a term as short as one month, 42 U.S.C. § 1437f(d)(2), the owner may, *a priori*, enter into a lease with a Section 8 tenant for a term of only one month. It does not follow, however, from the fact that a lease may permissibly be only one month in duration under the statute, that a tenant with a one year lease may only legitimately expect occupancy for one month at a time. Nor does it follow from the fact that a lease may only be for one month that Congress intended for the tenant to only have a legitimate expectation of tenancy undisturbed for one month regardless of the length of his lease. If there is any difference at all between a one month lease and a one year lease, it must be the legitimate expectations held under them.

Of course, the existence of the Section 8 eviction regulation, 24 C.F.R. § 882.-215, could lessen the objective legitimacy of the tenant's expectations. The eviction regulation promulgated by the Department of Housing and Urban Development, however, is in fatal conflict with the statute enacted by Congress. Under the statute, the PHA is the only party that can give a notice to vacate. 42 U.S.C. § 1437f(d)(1)(B). The regulation, however, permits the owner to send the notice to a tenant. 24 C.F.R. § 882.215. This conflict has already been noted in *Brown v. Harris*, 491 F.Supp. 845 (N.D.Cal.1980). "The agency charged with implementing the statute is not free to evade the unambiguous directions of the law merely for administrative convenience." *Id.* at 847. An administrative regulation that does so and that conflicts with the statute to which it is pursuant, is of no import and is but a nullity. *Manhattan General Equipment Co. v. Commissioner*, 297 U.S. 129, 134, 56 S.Ct. 397, 399, 80 L.Ed. 528 (1936). Since the eviction regulation is void, then, the tenants' legitimate expectation of midterm termination only for cause is not lessened. Plaintiffs, as Section 8 existing housing tenants, therefore have a property interest of which state government cannot deprive them without affording the tenants due process of law. U.S. Const. Amend. XIV.

### III. THE PROCESS DUE

"Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). The Supreme Court, however, has not set down any particular process in stone. Rather, the application of due process is a practical exercise and calls for flexibility. "It has been said so often ... as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands." *Id.* But the Supreme Court's commitment to some form of hearing before an individual is deprived of an interest in property has been constant and unyielding, *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 901, 47 L.Ed.2d 18 (1976), and

that Court has suggested an analytical framework for applying the due process clause to particular situations. Three distinct factors must be weighed in a balancing approach. First, the court must consider the private interest that will be affected. Second, the risk of an erroneous deprivation of such an interest through the procedures used, and the probable value, if any, of additional or alternative procedural safeguards should be considered. Finally, the government interest, both the physical and administrative burdens placed on government agencies and the government function involved, is to be weighed and enters into the balancing formula. *Id.* at 335, 96 S.Ct. at 903. This court will structure its analysis accordingly.

The severity of the deprivation of the property interest at stake provides an initial measure of the degree of the procedural protection that the individual is entitled to demand from government. The interest at stake here, an individual's interest in remaining in his home, is unquestionably substantial. *Burr v. New Rochelle Municipal Housing Authority,* 479 F.2d 1165 (2nd Cir. 1973). Initially, the court notes that an individual's interest in his home is traditionally afforded a certain degree of sanctity in our legal system. That sanctity finds its expression, among other places, in the fourth amendment, and it is no less entitled to recognition here.

Moreover, the fact that the housing involved in this case is provided by the government for those living at subsistence levels implicates special concerns. In this context, the normal burdens associated with the loss of one's home are of heightened intensity and additional burdens not present in normal circumstances are implicated. "The loss of assisted housing is likely to impose financial hardship on the evicted tenant. In addition to financial strain, the evicted tenant will suffer psychological deprivation relating to a change in neighbors and familiar surroundings. If a tenant is evicted for being undesirable, it is likely that he will be unable to qualify for other public housing or even private housing if

the stigma of being undesirable follows him." Klein and Shrider, *supra* at 344–45 (footnotes omitted).

The aggravated nature of need and deprivation in this case increases the weight to be afforded to the deprivation in the balancing scheme. *Goldberg v. Kelley,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Even the fact that a particular deprivation is of grave consequence, however, is not determinative. "Procedural due process rules are meant to protect persons not from the deprivation, but from the *mistaken* or *unjustified* deprivation of ... property." *Carey v. Piphus,* 435 U.S. 247, 259, 98 S.Ct. 1042, 1050, 55 L.Ed.2d 252 (1978) (emphasis added). Therefore, the court must consider not only the weight of the deprivation but the risk that the deprivation may be made erroneously. The flexible rules of due process are shaped by the risk of error inherent in the truth-finding process and the rules are meant to minimize erroneous deprivations by enabling individuals to contest the basis upon which the government proposes to deprive them of a property interest. *Id.* at 260, 98 S.Ct. at 1050. "If severity of deprivation is massive but the type of issue in dispute makes a requested procedure useless, then the interest of the individual in obtaining that procedure should be totally discounted." Note, "Specifying The Procedures Required By Due Process" 88 Harvard Law Review 1510, 1519 (1975) (footnote omitted).

Furthermore, procedural due process rules are shaped according to the risk of error in the generality of cases rather than in unusual cases. *Mathews,* 424 U.S. at 344, 96 S.Ct. at 907. Therefore, the court turns its attention to the value of due process rules in the particular context of the Section 8 Existing Housing Program.

In some cases information relevant to a decision to deprive an individual of a property interest and sufficient information to make the risk of error negligible may be obtained solely in writing. In fact, pertinent information may be more amenable to written than oral presentation in certain cases such as Social Security disability ben-

efits. 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18. In *Mathews v. Eldridge*, for instance, the decision that affected the property right in Social Security disability benefits was based on highly technical data. The decision was easily focused and the information on which it depended was easily documented. The key information, in fact, was a medical report. Although differing medical reports could have been obtained, credibility was not an important issue and the dispute over deprivation was not likely to turn on disputed issues of fact. In cases that are not technical and focused, however, written submissions are likely to be inadequate. *Id.* at 343, 96 S.Ct. at 906.

The termination of a Section 8 tenant for good cause is likely to be highly factual rather than technical, and the generality of cases is likely to involve determinations of credibility. By definition, Section 8 benefits are awarded to people with very small incomes. The court is aware that these individuals are unlikely to be advanced in educational attainment or highly skilled in the use or the techniques of English composition. This, of course, is not uniformly true, but as discussed above, the requisite due process rules must be defined in accordance with the generality of cases rather than in accordance with rare cases. The court is also aware that even among those highly educated, the ability to effectively present ideas in writing is rare. Therefore, to require Section 8 tenants to do so seems an especially futile exercise. To rest a decision regarding the deprivation of a Section 8 tenant's property right on a purely written presentation, is highly likely to result in error from the omission from consideration of unarticulated or unskillfully articulated arguments. Furthermore, written presentations will totally neglect questions of credibility, upon which the determinations of fact in a highly fact-specific dispute are likely to turn. *Goldberg*, 397 U.S. at 269, 90 S.Ct. at 1021.

■ This court finds, in agreement with *Goldberg v. Kelley*, that as in "almost every setting where important decisions turn on questions of fact, due process re-

quires an opportunity to confront and cross-examine adverse witnesses." *Id.* Therefore, an oral hearing is constitutionally necessary before a Section 8 tenancy may be terminated during the term of the lease. Balanced against the factors of the weight of the private interest and the risk of erroneous deprivation, is the weight of the governmental interests involved, the administrative burden that will be created by a hearing procedure, and the governmental function to be served.

Requiring GRFA to conduct a full evidentiary hearing in order to allow a landlord to terminate a Section 8 tenant would significantly add to the agency's administrative burden. The costs associated with this burden include both the expense of providing a large number of hearings and the cost of continuing benefits to those tenants properly terminated for good cause. "We only need say that experience with the constitutionalizing of government procedures suggests that the ultimate additional cost in terms of money and administrative burden would not be insubstantial." *Mathews*, 424 U.S. at 347, 96 S.Ct. at 908. Nor can administrative costs be considered in a vacuum. Administrative expenses are most likely to be met, not by increased funding for GRFA, but by decreasing the rent subsidy benefits currently being paid to eligible Section 8 families or that may become available to pay rent subsidies in the future. Thus, the cost of the hearing procedure is likely to be at the direct expense of the services provided by GRFA, and thus at the direct expense of those in need of housing assistance. This, the court believes, is neither in the interest of plaintiffs nor other Section 8 tenants.

The court must also consider the governmental interest in providing Section 8 rent subsidies, and that interest weighs into the due process balance that the court must strike. "Public assistance, then, is not mere charity, but a means to 'promote the general Welfare, and secure the Blessings of Liberty, to ourselves and our Prosperity.' The same governmental interests that counsel the provision of welfare, counsel as well its

uninterrupted provision to those eligible to receive it." *Goldberg*, 397 U.S. at 265, 90 S.Ct. at 1019. The governmental function and interest in the case of Section 8 rent subsidies for existing housing are identical to those expressed by the *Goldberg* Court.

Furthermore, in support of the Section 8 program and policy, the government has an interest in encouraging the participation of private owners. "If governmental due process standards are imposed on landlords, many private owners may be uninterested in participating in the program, especially if they can easily rent the same unit to nonassisted families who could be evicted without due process procedures." Heen, *Due Process Protection for Tenants and Section 8 Assisted Housing*, 12 Clearinghouse Review 1, 15 (1979). In sum, then, the government has an interest in continuing the rent subsidies program under the Section 8 Existing Housing Program. The court must consider the governmental interest in maintaining the level of Section 8 services and in encouraging the participation of private landlords, without whom the program could not function at all. The overall governmental interest in promoting the general welfare and in continuing to provide decent and safe housing for low-income families, like the individual interest involved, is heavy. Some balance must be struck.

The court believes that some form of hearing is necessary in order to comply with due process before a Section 8 lease can be terminated for cause. Furthermore, the court believes it necessary that the hearing take place before the deprivation is effected. *Boddie v. Connecticut*, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). Since the individual interest, the risk of erroneous deprivation, and the governmental interest in the present case are similar to the interest in *Goldberg*, the court finds that the hearing in the present case must conform to all of the procedural protections found necessary by the Supreme Court in *Goldberg*. The key concept guiding the provision of a hearing in this case must be to provide a hearing at a meaningful time to be held in a meaningful manner. *Goldberg*, 397 U.S. at 267, 90 S.Ct. at 1020.

The court does not believe, however, that GRFA must provide an administrative hearing in Georgia in order to provide a meaningful hearing at a meaningful time. The court has looked to Georgia law and found an existing procedure that is both appropriate to protect the property interest of plaintiffs in this case as well as constitutionally adequate. Furthermore, the existing procedure found in Chapter 61–3 of the Georgia Code represents a well-struck balance between the factors to be considered here. First, as discussed below, the state court proceeding meets the requirements of due process and allows the Section 8 tenant to adequately present his case to a state court judge prior to a threatened eviction. At the same time, the state court proceeding and the institution of state courts are already available and existing. Therefore, no further commitment of state resources not already contemplated and provided is required by this alternative. GRFA need not commit further resources or divert existing resources into providing hearings since the state court system is presently available. The procedure dictated in the Georgia Code is consistent with the height of due process concerns, and as a full evidentiary and adversary proceeding complete with a jury, it represents the best available truth-finding device that has been yet required by a court under the due process clause.

The Georgia proceeding does allow for a determination of good cause for lease termination. The statute explicitly provides that a landlord may use the procedure when a tenant fails to pay rent when due or holds over after a lease has ended. Thus, the statute defines cause as a failure to pay rent as well as a material breach of a lease that would cause the lease to terminate and make continued occupancy by the tenant a hold over situation. Ga.Code Ann. § 61–301. It is appropriate to defer to state law for a definition of good cause even though the Section 8 program is of federal origin. *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979). Since the court defers to state law to define good cause, deference to state

courts with their accumulated expertise in state law is a wise course.

The Georgia statute does not permit a lease termination at the landlord's will absent a valid clause in the lease permitting termination at will. Since a clause permitting the landlord to terminate at will would be invalid in the Section 8 context, the Georgia statutory procedure could not be used to effect a termination without good cause. Thus, the court is not disturbed by the criticism of using a state court proceeding expressed in *Owens v. Housing Authority*, 394 F.Supp. 1267 (D.Conn.1975) and *Brown v. Housing Authority*, 340 F.Supp. 114 (E.D.Wis.), *aff'd*, 471 F.2d 63 (7th Cir. 1972). Nor is the Georgia procedure flawed in limiting the availability of constitutional defenses or appeal to a higher state court.

Because the Georgia proceeding takes into account the interest to be protected under the Existing Housing Program, the court finds that it is an adequate protection for Section 8 tenants. *Joy v. Daniels*, 479 F.2d 1236 (4th Cir. 1973); *Anderson v. Denny*, 365 F.Supp. 1254 (W.D.Va.1973). Of course, the adequacy of state proceedings is a question of federal law in this case, *Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 1254 (1980), but the court believes the Georgia proceeding provides greater protection than the eviction proceeding approved by the Supreme Court in *Lindsey v. Normet*, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972). In that case, the Court approved an Oregon statute providing for summary proceedings to be held no later than 6 days after service of process absent a posting of security and for the limitation of issues at trial to whether or not a default had occurred. The Georgia procedure is not truncated either as to time, Ga.Code Ann. § 61–303, or as to issues. Furthermore, the Georgia statute is without the pernicious equal protection violation contained in the Oregon statute that a losing tenant post double-bond to appeal. Ga.Code Ann. § 61–306.

This state court option also furthers the congressional purpose of allowing families assisted under the Section 8 program to function as non-assisted families in the private housing market. Since the procedure in Chapter 61–3 of the Georgia Code would have to be followed by a landlord for a tenant in the unassisted private housing market, using the same procedure for a Section 8 lease is presumably consistent with congressional purposes. Of course, the 30 day termination clause, which is forbidden in the context of the Section 8 Existing Housing Program, could be used to terminate a lease, create hold over status, and trigger the Chapter 61–3 procedure in the case of an unassisted tenant. Aside from prohibiting the 30 day termination clause, which this court has found that Congress intended to do, the Section 8 family would function exactly as does an unassisted family. The Georgia procedure, then, is both constitutionally adequate and statutorily preferable.

■ Of course, the statute creating the Section 8 program still requires the PHA to review a landlord's request for lease termination for good cause. Despite the fact that due process must occur before a Section 8 family can be finally deprived of its lease and evicted, GRFA cannot ignore the congressional mandate to review a landlord's request. If it finds no good cause, it cannot authorize the termination, hold over status will not arise, and the landlord cannot gain an eviction order in state court without challenging the validity of GRFA's denial of his request. GRFA must exercise due care in discharging its statutory responsibility. The court, however, declines to specify a particular procedure by which the Authority should comply with the statute, but the court does hold that GRFA need not have a separate hearing on the question of whether or not the landlord has good cause for termination before it authorizes a termination or before it issues a notice to evict. Neither justice nor due process of law requires that two hearings be held. *Goldberg*, 397 U.S. at 267 n.14, 90 S.Ct. at 1020 n.14. Since state law provides a proceeding adequate to determine if good cause for termination exists before a deprivation can occur, GRFA is relieved from the burden of pro-

viding a hearing that would be redundant and wasteful of social resources.

The court's order minimizes the burdens on the private landlord and on the state while protecting the property interest of Section 8 tenants. Since the Section 8 owner would have to go to court in Georgia anyway to evict a tenant who did not acquiesce in the eviction, the "landlord would be spared the burden of two hearings and he would be assured of being able to evict any tenant who was violating a material lease provision or state law." Klein & Schrider, *supra* at 348. An argument might be made that relying on the Georgia procedure, rather than a summary administrative procedure, in some cases may be adverse to public health and safety or to the well-being of other tenants. The Georgia procedure provides for expedience, however, and the state courts presumably would be aware of the need for haste when that need existed. Ga.Code Ann. § 61–303.

The court's solution to this problem is arguably flawed by leaving the task of evolving doctrine which defines good cause for a federal program to state courts. Note, *supra* at 908–09. This court believes, however, that state courts are the appropriate forum to develop a doctrine of good cause for lease termination if one need be developed. The Georgia statute contemplates such a good cause doctrine, Ga.Code Ann. § 61–301, and the federal law seems to contemplate that Section 8 tenants should be subject to the state substantive law of landlord-tenant relations. Finally, the judicial process for holdover evictions in the superior courts of Georgia is subject to review by a higher state court, and in the event of misapplication of federal law, may be reviewed by the Supreme Court of the United States.

It has also been suggested that requiring state court litigation will increase the cost to the parties of dispute resolution. Assuming this to be true, the court is not convinced that requiring the parties to bear their own costs is unwise. Requiring the parties to bear their own costs in settling their own disputes in state court rather than judicially requiring all the citizens of Georgia to subsidize an administrative hearing and dispute resolution procedure, either at the cost of additional funding to or in decreased availability of rent subsidies, has the advantage of placing the financial burden of dispute resolution on the parties who are best able to avoid requiring the state to intervene in their private dispute. The court is unwilling to require the citizens of Georgia to provide a dispute resolution mechanism beyond the state court system that they have already provided in order to keep the peace. Of course, tenants are unlikely to be able to hire private legal assistance in defending an action brought under section 61–301 of the Georgia Code. Tenants, however, will have access to legal assistance for which the state and its citizens have already provided funding. The resources so committed will be further strained by defending hold over actions, but the due process clause does not require the public to unwillingly commit further resources to this purpose. *Goldberg*, 397 U.S. at 270, 90 S.Ct. at 1021.

Finally, the court is unconvinced that private landlords will be unduly burdened by requiring them to use the Georgia proceeding against tenants holding over. Since the private landlord would be forced to resort to the same procedure against a tenant unassisted by Section 8 subsidies, the private sector is no more attractive than the Section 8 Existing Housing Program, at least as to eviction procedures. Although termination at will is permissible in a private lease but not in the present Section 8 context, the court believes Section 8 landlords are the recipients of other benefits that, on the whole, counterbalance this inconvenience. At worst, the difference in attractiveness, is not so great as to result in a mass exodus of private landlords from the Section 8 Existing Housing Program.

## IV. CONCLUSION

On June 30, 1980, this court issued and stayed a preliminary injunction against defendants pending a hearing at which defendants had the opportunity to show cause

why the injunction should not be made permanent. That hearing was held on August 27, 1980, and the court has carefully considered the briefs and arguments presented. Based on the foregoing reasoning, the court vacates its June 30 injunction and order insofar as it conflicts with the present order. Since the court has found that plaintiffs are adequately protected by state court proceedings, no injunction will issue, and plaintiffs request for injunctive relief is hereby DENIED. Until it has evidence to the contrary, the court assumes that defendants, most of whom are officers or agencies of the state or federal governments, will comply with its order. *Bailey v. Patterson*, 323 F.2d 201 (5th Cir. 1963), *cert. denied*, 376 U.S. 910, 84 S.Ct. 666, 11 L.Ed.2d 609 (1964).

In conclusion, plaintiffs' motion for summary judgment is GRANTED and declaratory relief is GRANTED as set forth above in accordance with the opinion of the court.

All other motions pending in this case not resolved by this order are now moot and are therefore DENIED.

So ORDERED.