955 F.2d 247
 Robert PEYTON, Christine Williams, Plaintiffs-Appellants,
v.
REYNOLDS ASSOCIATES, Community Management Corporation of
Maryland, Defendants-Appellees,
and
Alexandria Redevelopment & Housing Authority, Defendant.
 No. 91-1035.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 3, 1991.
Decided Jan. 29, 1992.
 
 Paul Anthony Fiscella, Legal Services of Northern Virginia, Inc., Alexandria, Va., argued (Clare L. McCulla, on brief), for plaintiffs-appellants.
 Barbara Purse Beach, Beach, Butt & Associates, P.C., Alexandria, Va., for defendants-appellees.
 Before MURNAGHAN, Circuit Judge, HERLONG, District Judge for the District of South Carolina, sitting by designation, and HOWARD, District Judge for the Eastern District of North Carolina, sitting by designation.
 OPINION
 MURNAGHAN, Circuit Judge:
 
 
 1
 The appeal here presented involves a claim that Reynolds Associates and Community Management Corporation of Maryland,[1] owner and management company, respectively, of the Essex House in Alexandria, Virginia, violated 42 U.S.C. § 1437f(t) (1988). The statute prohibits an owner, who has entered certain contracts for housing assistance payments, from refusing to lease to a voucher holder and refusing to enter a voucher contract if a proximate cause of such refusal is the status of the tenant as a voucher holder. Certain tenants appeal from the district court's grant of Reynolds' motion for summary judgment, and the denial of their own motion for summary judgment.
 
 I.
 
 2
 Essex House, a highrise apartment building in Alexandria, Virginia with 209 units, was constructed for low and moderate income tenants and has so operated since opening in 1976. The majority of the tenants are families, elderly or disabled, and rents are artificially low. Reynolds participated in several Housing & Urban Development ("HUD") programs for provision of housing assistance to the elderly, disabled, and families with low and moderate incomes, including the "Set-Aside Program," Section 8 of the National Housing Act of 1974, as amended, 42 U.S.C. § 1437f, under which sixty units were "set aside" for low-income tenants, who paid up to thirty percent of their income as rent and for whom HUD paid the remainder.
 
 
 3
 Reynolds exercised its right to terminate participation in the Section 8 Set-Aside Program and so notified HUD in March, 1989. HUD offered housing assistance to the affected tenants through another Section 8 program, the housing voucher program, to begin upon expiration of the outstanding Set-Aside contract; the Set-Aside contract for forty-two units was to expire on September 30, 1990, and the contract for the remaining eighteen units was to expire on January 31, 1991.
 
 
 4
 Whereas the Set-Aside Program is administered directly by HUD, the housing voucher program is administered through a local public housing authority, as HUD's agent. The agent receives funding for the program from HUD. The housing voucher program for Essex House tenants was to be administered by the Alexandria Redevelopment Housing Authority ("ARHA"), the public housing agency for Alexandria. HUD agreed to provide sixty vouchers to ARHA, specifically for the Essex House residents already receiving assistance under the Set-Aside program. The tenants similarly would pay only a portion of the rent and ARHA would pay the remainder through the receipt of funds from HUD.
 
 
 5
 Upon receipt of a voucher, an applicant may apply to a present landlord or seek other rental property. An owner who chooses to accept a voucher holder as a tenant provides ARHA with an unexecuted lease. ARHA first inspects the property according to the Housing Quality Standards ("HQS") issued by HUD. ARHA then provides a lease addendum and a Housing Assistance Payments ("HAP") contract for each unit and tenant. The lease addendum, a pre-printed form issued by HUD, contains the special requirements for the voucher program. The HAP contract and lease are to be co-terminous, although the pre-printed HAP contract does not contain a term of duration. ARHA maintained that HUD requires a twelve-month lease and thus a twelve-month contract.
 
 
 6
 On September 18, 1990, which was eighteen months after HUD received notification of Reynolds' withdrawal from the Set-Aside Program and less than two weeks prior to the expiration of assistance for those tenants covered under the Set-Aside contract expiring on September 30, 1990, Reynolds first received the documents it was required to execute to permit the tenants to participate in the housing voucher program. Reynolds was unwilling to agree to some of the terms in the form documents. The requirements that the tenants sign new leases with one-year minimum terms and the provision that Reynolds' endorsement of the monthly payment checks from ARHA constitutes a certification that the units are "decent, safe and sanitary in accordance with the HUD Housing Quality Standards ..." were stated to be the primary concerns; other objections raised at the time were not pursued during the ensuing litigation. Reynolds objected to entering one-year lease terms, without the provision for HUD-approved rent increases, on the grounds that each tenant was already a party to a HUD-approved lease that would expire in less than one year. Reynolds objected to certifying that the units meet the HQS requirements, in part because Essex House had ubiquitous asbestos that had been encapsulated but not removed.
 
 
 7
 Reynolds immediately contacted both ARHA and HUD to request a meeting, but both refused to meet. ARHA separately refused to meet in response to another Reynolds' request. Unilaterally, Reynolds modified and executed all of the required documents and submitted them on September 28, 1990. Reynolds' modifications to the form documents included two significant changes: (1) a contract term of less than one year was exchanged for the one-year term and (2) the requirement that Reynolds certify compliance with the Housing Quality Standards was deleted. ARHA maintained that it could not modify these documents, as they were issued by HUD, pursuant to statute and regulation.
 
 
 8
 Tenants Robert R. Peyton, Rosa Lee Snider, and Christine Williams ("Tenants") instituted a suit in the United States District Court for the Eastern District of Virginia, seeking injunctive relief.[2] Tenants claimed violations of the Housing and Community Development Act of 1987, 42 U.S.C. § 1437f(t), alleging that Reynolds' refusal to accept the Tenants' vouchers and to enter into voucher contracts with ARHA constituted unlawful discrimination against voucher holders. They also asserted violations of the Fair Housing Act, 42 U.S.C. § 3601 et seq., and the Virginia Fair Housing Law, Va.Code § 36-86 et seq., which were dismissed and have not been appealed, and sought class certification. ARHA was joined as a party-defendant.
 
 
 9
 The Tenants sought to compel Reynolds to sign the documents as submitted, and Reynolds filed a cross-claim against ARHA. The Tenants moved for partial summary judgment pursuant to Federal Rule of Civil Procedure 56, and for class certification. Reynolds moved for summary judgment on the Tenants' claims and on the cross-claim against ARHA, and ARHA moved for summary judgment and to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). The district court granted Reynolds' motion for summary judgment against the Tenants, denied the Tenants' motions, and dismissed all claims against ARHA. Upon considering the Tenants' appeal of both the grant of Reynolds' motion for summary judgment and the denial of their own motion for summary judgment, we hereby affirm the judgments of the district court.
 
 II.
 
 10
 We first consider the district court's decision to grant Reynolds' motion for summary judgment. The nondiscrimination provision of the Housing and Community Development Act of 1987 provides, in pertinent part:
 
 
 11
 No owner who has entered into a contract for housing assistance payments under this section on behalf of any tenant in a multi-family housing project shall refuse--
 
 
 12
 * * * * * *
 
 
 13
 (B) to lease any available dwelling unit in any multi-family housing project of such owner to a holder of a voucher under subsection (o) of this section, and to enter a voucher contract respecting such unit, a proximate cause of which is the status of such prospective tenant as a holder of such voucher.
 
 
 14
 42 U.S.C. § 1437f(t)(1) (emphasis supplied). In considering Reynolds' motion for summary judgment, the district court properly held that the Tenants failed to meet their burden to present some evidence creating a triable issue of fact on the claim that Reynolds' refusal to execute the contract and lease was proximately caused by the Tenants' status as voucher holders. See Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
 
 
 15
 Requirements for the housing voucher contract are set forth in 42 U.S.C. § 1437f(d):
 
 
 16
 (1) Contracts to make assistance payments entered into by a public housing agency with an owner of existing housing units shall provide (with respect to any unit) that
 
 
 17
 * * * * * *
 
 
 18
 (B)(i) the lease between the tenant and the owner shall be for at least one year or the term of such contract, whichever is shorter, and shall contain other terms and conditions specified by the Secretary; and
 
 
 19
 * * * * * *
 
 
 20
 (D) the agency and the owner shall carry out such other appropriate terms and conditions as may be mutually agreed to by them.
 
 
 21
 (2)(A) Each contract for an existing structure entered into under this section shall be for a term of not less than one month nor more than one hundred and eighty months....
 
 
 22
 Although section 1437f(d)(1)(B)(i) may not be a model of clarity in legislative drafting, the plain reading is that a lease term shorter than one year is authorized, whenever the term of the contract between the owner and the public housing agency is for less than one year. Section 1437f(d)(2)(A) permits the term of the contract between the owner and the public housing agency to vary from one to 180 months. Therefore, the statutes cannot be read to require a contract term of one year. See also Jeffries v. Georgia Residential Fin. Auth., 503 F.Supp. 610, 618 (N.D.Ga.1980), aff'd, 678 F.2d 919 (11th Cir.), cert. denied, 459 U.S. 971, 103 S.Ct. 302, 74 L.Ed.2d 283 (1982). In addition, the housing voucher contract issued by HUD nowhere specifies that it must be for one year. It merely provides that the housing voucher contract must be co-terminous with the lease entered by the tenant and the owner, which accords with the requirements of 24 C.F.R. § 887.209(c). Thus, as long as it ends on the last day of the lease between the tenant and the owner, the housing voucher contract permits any length of term. Furthermore, while there are regulations pertaining to the first year of the lease between the tenant and the owner, none support the position that the voucher contract and the co-terminous leases are required to be for one-year terms. See, e.g., 24 C.F.R. § 887.209(b)(1) (rent cannot be increased during first year of lease); 24 C.F.R. § 887.209(c)(2)(v) (owner may offer new lease after first year of lease); 24 C.F.R. § 887.213(b)(2) (limitations on reasons for termination during first year of lease).
 
 
 23
 Reynolds offered to enter a housing voucher contract which would, along with the leases, expire on the same dates as the existing leases with the tenants. Although the voucher program regulations prohibit increasing the rent during the first year of a lease, Reynolds has stated that it wanted the lease terms to correspond to the terms of the prior leases because it intended to try and obtain credit towards the "first year" for the portion of each lease during which assistance was provided under the Set-Aside program. Since neither the statutes, the regulations, nor HUD's standard form contract mandates that the owner enter a housing voucher contract and leases for one-year terms, Reynolds' refusal to agree to one-year terms could not, in and of itself, constitute discrimination against the Tenants on the basis of their status as voucher holders as proscribed by 42 U.S.C. § 1437f(t).
 
 
 24
 The Tenants have argued that Reynolds' objection to the one-year terms is discriminatory because HUD has the authority to require Reynolds to enter one-year leases. Yet the Tenants rely on a faulty reading of 42 U.S.C. § 1437f(d)(1)(B)(i) by ignoring the phrases "or the term of such contract, whichever is shorter," and reading, with that omission, only that "the lease ... shall be for at least one year...." The Tenants have also argued that the regulations, which place restrictions on the first year of the lease, create an administrative framework in which a one-year lease term may be required. Yet no regulation specifying a one-year lease term appears to exist. Moreover, such a regulation would be inconsistent with the express language of the statute permitting lease terms of less than one year when the contract with the public housing agency is shorter than one year. If a regulation reflects an administrative interpretation which is inconsistent with the plain language of the statute under which it is promulgated, we do not defer to the agency's interpretation. Public Employees Retirement Sys. of Ohio v. Betts, 492 U.S. 158, 171, 109 S.Ct. 2854, 2863, 106 L.Ed.2d 134 (1989). Consequently, the district court properly concluded that Reynolds' objection to such a requirement could not support a claim for discrimination under 42 U.S.C. § 1437f(t).
 
 
 25
 The second basis for the Tenants' allegations of discrimination stems from Reynolds' objection to the contract's provision that endorsement of the checks from ARHA would certify compliance with the Housing Quality Standards. Reynolds took the position that, because asbestos in Essex House is ubiquitous, and because Reynolds had unsuccessfully sought to obtain financing from HUD to remove the asbestos, certification that the building was safe could create a potential avenue for criminal liability. The Tenants have emphasized that Reynolds' concerns about encapsulated asbestos were not supported by scientific evidence and that Reynolds already was subject to a legal obligation to maintain safe conditions under both the Set-Aside Program and Virginia law. Nonetheless, the statutes do permit modification of the contract between the public housing agency and the owner, 42 U.S.C. § 1437f(d)(1)(D), and the regulations authorize variations to the HQS acceptability criteria. 24 C.F.R. § 887.251.
 
 
 26
 The district court stated, in its memorandum opinion dated January 15, 1991: "The court is not persuaded that Reynolds is correct in its expressed fear of potential liability in certifying as to the compliance with housing quality standards. On the other hand, the court cannot find on this record that the expressed fear is either unreasonable or pretextual." (Footnote omitted). However, accepting that an unjustified objection to the HQS certification could signify that the objections are pretextual, and thus perhaps based on the status of the Tenants as voucher holders, summary judgment in favor of Reynolds was nonetheless proper. The burden was on Reynolds as landlord to produce evidence as to the basis of the objections. As to the prolonging of lease terms, it did so. The district court concluded that there was no statutory basis for ARHA's position that the contract and the co-terminous lease must be for one-year terms. While there may be a question of reasonableness as to the refusal of Reynolds to certify compliance to the HQS, Reynolds made a strong and compelling case for the point that the one-year term requirement was unjustified. In the absence of any indication that such objection was pretextual, the refusal cannot be deemed to be proximately caused by the status of the Tenants as voucher holders. Because ARHA's insistence on a term unsupported by either the statute or the regulations was identified as a legitimate cause for Reynolds' refusal to enter the contract, the objections to the HQS certification could not be deemed to be an actual cause of Reynolds' refusal. We cannot state that "but for" the objection to the HQS certification, Reynolds would have entered the contract, because the objection to the one-year term was valid. Because the "but for" test fails to show that the objection to the HQS certification was an actual cause of Reynolds' refusal to enter into the contract, it cannot be deemed to be a proximate cause.
 
 
 27
 The Tenants have attempted to approach the same argument from a different angle. Even accepting Reynolds' explanation for its objections, they have argued that the Tenants' status as voucher holders was nonetheless the proximate cause of Reynolds' refusal: "but for" the "necessary incidents to their status, such as the requirements of the voucher program itself, Reynolds would have rented to them." The Tenants then state that "legitimate objections to the status of the Tenants as tenants such as problems with bad references or a history of disruptive behavior" could "interrupt" proximate cause. Yet the Tenants' argument has failed to recognize that "legitimate objections" are not like "intervening" causes which can "interrupt" proximate causation in the tort context. See, e.g., Exxon Corp. v. Amoco Oil Co., 875 F.2d 1085, 1088-89 (4th Cir.1989). Instead, such "legitimate objections" would preclude a finding of proximate cause due to the absence of actual cause, or cause-in-fact. Moreover, "legitimate objections" can encompass more than just the particularized objections to voucher holders recognized by the Tenants, such as Reynolds' objection to an unjustified requirement of the housing voucher program in the instant case.
 
 
 28
 The Tenants also have focused on the district court's burden of proof. Referring to the court's statement that it could not "find on this record that the expressed fear is unreasonable or pretextual," the Tenants have argued that the district court improperly failed to adopt the shifting burdens analysis that has developed under Title VII employment discrimination jurisprudence. See, e.g., McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). According to the Tenants' analysis, they established a prima facie case by showing the discriminatory effect of Reynolds' objections on the voucher holders; thus, the burden of proof shifted to Reynolds to demonstrate a sufficiently compelling business necessity. When Reynolds introduced evidence to justify its objections, under the Tenants' interpretation, the issue then must be resolved by a trier of fact, with the ultimate burden at trial on the Tenants to establish that the asserted reasons were pretextual. Thus, the Tenants have contended that the district court erred because it improperly required the Tenants to disprove Reynolds' business necessity defense to defeat Reynolds' motion for summary judgment. The argument is not persuasive. The district court's statement that it could not find that Reynolds' fear was pretextual referred specifically to the HQS certification. The court had already concluded that there was no basis for ARHA's refusal to permit Reynolds to enter a contract and lease terms of less than one year. Once Reynolds demonstrated a business necessity defense, the burden was on the Tenants to establish some triable issue of fact to defeat Reynolds' motion for summary judgment. The district court correctly found that the Tenants failed to do so. We, therefore, need not reach the question of whether, in the absence of the legitimate objection to the one-year requirement, the evidence as to Reynolds' objections to the HQS certification sufficiently demonstrated a legitimate business necessity so as to warrant the grant of summary judgment.
 
 
 29
 Summary judgment is, of course, inappropriate in cases in which there is a dispute regarding the conclusions to be drawn from the facts. Magill v. Gulf & Western Indus., Inc., 736 F.2d 976, 979 (4th Cir.1984). Nevertheless, though Reynolds' motivation as to the HQS dispute arguably is at issue here, no conflicting inferences as to proximate cause may satisfactorily be drawn from the facts at hand because Reynolds' pertinent reason for refusing to enter a housing voucher contract of no less than one year was not shown to be pretextual. Summary judgment in favor of Reynolds was properly granted.
 
 III.
 
 30
 Because a final decision in favor of Reynolds was reached by the grant of Reynolds' motion for summary judgment, we address the district court's denial of the Tenants' motion for summary judgment. See Abend v. MCA, Inc., 863 F.2d 1465, 1482 n. 20 (9th Cir.1988); Barhold v. Rodriguez, 863 F.2d 233, 237 (2d Cir.1988); C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3914 at 588 n. 62 (1976).
 
 
 31
 The Tenants' argument that Reynolds' refusal to enter into a voucher contract on HUD's terms is necessarily an objection to the status of the voucher holders is flawed. The Tenants have argued:
 
 
 32
 It is not disputed that HUD directed Reynolds to participate in the voucher program on the terms as submitted to Reynolds by ARHA. Clearly, these requirements are necessary incidents of the status of the Tenants as voucher holders. Objecting to these requirements is, in effect, objecting to this status. Nor could the refusal be caused by anything other than this status. For the fact that Reynolds was already renting to the Tenants is conclusive proof that it had no legitimate objection to them as tenants.
 
 
 33
 We cannot accept the Tenants' claim that, because Reynolds was already renting to the Tenants, any objection by Reynolds to a contract term imposed by HUD must as a matter of law constitute a violation of 42 U.S.C. § 1437f(t)(1). That would permit totally unrestricted carte blanche to one of the parties to a contract.
 
 
 34
 The Tenants have relied primarily on Glover v. Crestwood Lake Section 1 Holding Corps., 746 F.Supp. 301, 309 (S.D.N.Y.1990), in which the court stated that the defendant Crestwood's "refusal to accept certain provisions of the HUD-mandated Section 8 voucher lease cannot be interpreted as anything but a refusal to rent an apartment to a Section 8 voucher holder applicant as a result of that applicant's status as a Section 8 voucher holder." However, the statement in Glover that Crestwood's opposition to the voucher contract's provisions could only be understood as a refusal based on the applicant's voucher holder status hinged on the fact that Crestwood did "not deny that plaintiff's and the other class members' participation in the Section 8 voucher program [was] 'a proximate cause' of Crestwood's refusal to lease an available apartment to them. 42 U.S.C. 1437f(t)." Glover, 746 F.Supp. at 308. Crestwood admitted that applicants' status as voucher holders was the basis for the refusal to rent to them, but argued that the voucher holders did not have a private right of action for such discrimination. Id. Here, in contrast, Reynolds has vigorously denied that the Tenants' status as voucher holders was "a proximate cause" of the refusal to enter into the voucher contract that ARHA demanded. In addition, Reynolds already leased apartments to the Tenants, and sought to execute modified documents. The objection to a unilateral extension of the lease terms beyond the terms in the existing leases had no connection to the Tenants' status as voucher holders; it could have been expected in the case of any tenants, voucher holders or not. Thus, Glover does not shed light on the question of whether Reynolds' opposition to certain voucher contract provisions was proximately caused by a desire not to lease to voucher holders. The district court properly held that the Tenants had not established that, as a matter of law, Reynolds' objection to certain contract terms was an objection based on their status as voucher holders, so as to violate 42 U.S.C. § 1437f(t).
 
 
 35
 Therefore, the judgments of the district court are
 
 
 36
 AFFIRMED.
 
 
 
 [1]
 Hereafter jointly referred to as Reynolds
 
 
 [2]
 Subsequently, Rosa Lee Snider withdrew from the suit