Lillian RIDDICK, Plaintiff,

v.

SUMMIT HOUSE, INC., as grantee of Ferris Avenue Redevelopment Company, Inc., Summit House Cooperative Board, Regina S. Hunt, President, Elm Management Associates, Inc., Kelvin Murray, Manager & Bert Santos, Manager, Defendants.

No. 92 Civ. 2770 (VLB).

United States District Court,
S.D. New York.

Oct. 18, 1993.

Michael D. Hampton, Ann McDonald, Kitley Covill, White Plains, NY, for plaintiff.

Kenneth J. Finger, Finger & Finger, White Plains, NY, for defendants.

## MEMORANDUM ORDER

VINCENT L. BRODERICK, District Judge.

### I

Plaintiff Lillian Riddick ("Riddick"), a tenant in a privately owned federally subsidized building, finds herself caught between regulatory requirements imposed by the U.S. Department of Housing and Urban Development ("HUD") concerning such buildings, and objections by the defendant owners and managers of the building (collectively "Summit") that they never agreed to become subject to such requirements.

Summit contends that current HUD requirements are improper and hence has refused to sign agreements necessary for Riddick to continue to receive a federal rent subsidy. The underlying dispute, entirely beyond Riddick's control, arises between HUD and Summit, but has sideswiped Riddick, depriving her of her subsidized tenancy.

It is the duty of the courts to find ways to uphold the rights of all parties and not to permit any rights improperly to be forfeited because of the complexity of the legal structure.[1]

### II

This litigation arises under two landmark federal housing statutes:

(a) the National Housing Act enacted June 27, 1934, ch. 847, 48 Stat. 1246, § 221, now

---

1. See *Bowen v. City of New York*, 476 U.S. 467, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986); see generally New York State Bar Ass'n, Task Force on Simplification of the Law, Introduction to Federalist Papers for the Twenty–First Century (1989).

codified as 12 U.S.C. § 1715*l* ("§ 221"), granting federal credit assistance for housing provided under the Act, and

(b) Section 8 of the Act of September 1, 1937 ch. 896, as added by 88 Stat. 662 (1974), now codified as amended, as 42 U.S.C. § 1437f ("§ 8"), granting rent subsidies to qualified low-income tenants.

Jurisdiction is predicated upon 28 U.S.C. § 1331.

### III

Summit has received both kinds of subsidy; Riddick is a beneficiary of the § 8 program. The parties have submitted the case for disposition by the court based on agreed facts.[2]

On December 29, 1966 Summit as a recipient of federal mortgage assistance under the National Housing Act of 1934 signed a "Regulatory Agreement" providing that Summit as mortgagor "may be regulated and restricted by the Commissioner as provided for in [§ 221] and the applicable Rules ..." Relevant regulations, 24 CFR § 221.530(a), permit HUD to regulate rents charged by mortgagors under § 221.

24 CFR § 822.110 authorizes rent subsidies to qualified tenants in buildings operated by mortgagors covered by § 221, which are provided pursuant to § 8; Summit accepted such tenants subsidized under § 8 at least as early as 1986.

Section 8 provides that no "owner who has entered into a contract for housing assistance payments under this section on behalf of any tenant in a multifamily housing project shall refuse ... (B) "to lease any available dwelling unit ... to a holder of a certificate of eligibility under this section a proximate cause of which is the status of such prospective tenant as a holder of such certificate, and to enter into a housing assistance payments contract respecting such unit ..." 42 U.S.C. § 1437f(t)(1)(A).

In effect this means that owners who have already taken § 8 tenants must continue to do so and sign necessary agreements unless their failure to do so occurs for reasons other than the status of the tenant as a § 8 subsidy recipient. Summit continued to accept subsidized tenants under § 8 after subsection (t) was added in 1988 by Public Law 100–242 § 147. Summit also signed agreements since 1986 substantially similar to the one it now refuses to sign.[3]

Notwithstanding its prior acceptance of virtually identical terms, Summit now refuses to sign documents required by HUD for current renewal of Riddick's subsidy on the ground that those documents went beyond what Summit was properly required to accept. Summit's refusal has led to loss of Riddick's § 8 subsidy, which is the basis of her lawsuit against Summit.

This is not a case in which Summit can credibly claim unfair surprise in regard to the provisions of the current HUD § 8 contract, providing Summit with a bona fide business reason for not signing it. See *Martin v. Joseph Harris Co.*, 767 F.2d 296 (6th Cir.1985); *Sierra Diesel Injection Service v. Burroughs Corp.*, 890 F.2d 108, 112–15 (9th Cir.1989); *West American Ins. Co. v. Park*, 933 F.2d 1236, 1239 (3d Cir.1991).

Summit, a sophisticated institutional entity able to obtain advice of counsel, cannot claim to have been misled by technical legal language or fine print in the standard forms it executed, nor that it not have access to relevant statutes and regulations defining its obligations if it accepted §§ 8 and 221 subsidies; it can properly be held to its contractual commitments. See *D.H. Overmeyer Co. v. Frick Co.*, 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972); *Swarb v. Lennox*, 405 U.S. 191, 92 S.Ct. 767, 31 L.Ed.2d 138 (1972) (confessions of judgment by sophisticated business entities upheld); *Northwestern National Insurance Co. v. Donovan*, 916 F.2d

---

**2.** I note the statecraft shown by counsel for both sides in avoiding the need for a time-consuming trial and agreeing on all pertinent facts, thus furthering the objectives of Fed.R.Civ.P. 1 and the Judicial Improvements Act of 1990, Public Law 101–650, 104 Stat. 5089, enacting 28 U.S.C. § 473.

**3.** Compare Defendants Submission of Documents, Exh. M, N with Plaintiff's Supplement Appendix II, Exhibit B2.

372 (7th Cir.1990) (treating status of parties as millionaires as significant background fact in evaluating fairness of holding them to forum selection clause); *Lone Star Industries v. Nelstad Material Corp.*, 811 F.Supp. 147 (S.D.N.Y.1993) (principal of corporation signed guarantee of its debts without specifying maximum limit of liability).

Summit argues that its refusal to sign the current HUD § 8 agreement because of its objectionable features, and not Riddick's status as a § 8 subsidy recipient, is the proximate cause of Riddick's loss of her status as a Summit tenant under § 8 and hence there is no violation of 42 U.S.C. § 1437f(t). This may be so if and only if there is a bona fide business reason or legitimate non-pretextual ground for declining to sign the HUD agreement apart from the status of the tenant as a § 8 subsidy recipient. *Peyton v. Reynolds Associates*, 955 F.2d 247 (4th Cir.1992) (requiring a longer lease than previously involved).

Since § 221, Summit's Regulatory Agreement and its prior § 8 agreements authorize the provisions now complained of, Summit would have a bona fide business reason to object to the current agreement only because of changed circumstances in its own business or in the administration of the § 8 agreement (not claimed here) or if signature of the § 8 agreement would estop Summit from contesting a) whether it was properly adopted, or b) unauthorized or confiscatory administration of that agreement in the future.[4]

### IV

I decline to adopt the preliminary objections raised by Summit and its contention that HUD's current § 8 contract requirements are improper on their face as applied to Summit, but I find that Summit is entitled to contest the validity of HUD-required agreements and their implementation before or with HUD authorities or their local authority representatives. Summit may do so without being deemed to have waived such objections by signing the current HUD § 8 subsidy contract.[5]

I deny Riddick's application for punitive damages, reserve decision on Riddick's application for attorney's fees and direct the parties to consider a potential resolution of their dispute as discussed below. I authorize an application for relief as described below if no resolution is agreed to. I also authorize Summit to add relevant governmental agencies as third party defendants if otherwise appropriate.

I also deny both Summit's application for relief because of alleged contact by Riddick's counsel with its personnel prior to filing of this case, and Riddick's application for sanctions against Summit's counsel under Fed. R.Civ.P. 11 for raising this issue.

### V

Since the enactment of the 1934 National Housing Act, Congress has recognized the need for housing as a subject of national concern. This concern accelerated during the Second World War and its aftermath. The primary original expression of the policy, exemplified here by § 221, was through credit assistance for construction benefitting low or middle income families. Federal involvement expanded in response to postwar housing shortages, and initially took the form of GI Bill of Rights loans to veterans and assistance in housing construction. One of the crucial aspects of federal housing efforts has been the ability of Congress to require appropriate conditions in return for federal assistance, balanced against the need for private parties to be able to invest with confidence that they will not be subjected to unpleasant surprises in the form of unexpectedly imposed additional burdens.

---

**4.** Summit claims that 42 U.S.C. § 1437f(t) does not apply because Riddick is a current rather than prospective tenant. This overlooks the fact that Riddick is seeking a new tenancy with a § 8 certificate.

**5.** Implementation, including the speed or delay experienced in resolving problems, may be at least as important as the text of the regulations involved. See *Dollar Dry Dock Bank v. Denning*, 148 F.R.D. 124 (S.D.N.Y.1993). Accordingly, the objectives set forth in Fed.R.Civ.P. 1 require that a reasonably prompt remedy for unduly burdensome or improper implementation be provided if courts are to require private parties, by virtue of their prior commitments, to execute a contract text laid down by public sector authorities.

Section 221 permits regulation of mortgagors under the National Housing Act, but the regulation must be within the purposes of the Act and consistent with due process under the Fifth Amendment. Section 221 specifically authorizes HUD to supervise rents charged by mortgagors receiving federal credit assistance; since price is the "central nervous system" of economic activity [6] the ability of HUD to regulate subordinate aspects of the building may be inferred, up to but not beyond the point where restrictions not specifically consented to become unduly burdensome or confiscatory.[7]

While it has long been virtually undisputed that the free market is generally the best vehicle for providing consumer goods, low and moderate income housing for core urban areas has presented special problems leading to legislative responses. Seasonal instability and high sensitivity to changes in the economic climate produce uncertain job opportunities, making higher hourly wages necessary to enable those employed in the industry to make a living, and leading to job-protection work rules confining members of a given trade to work within its limits, all of which raise costs to the end-user.[8] Concern for stability in local jobs and for local contractors encouraged use of local building rules to bar out-of-state manufactured housing components which might lower costs.[9]

One approach to these dilemmas has been the use of the federal banking and currency power to contribute to providing, in return for various commitments by the developers, long-term financing for construction of housing designed for low or moderate income occupancy. The National Housing Act of 1934 represented a step in that direction.[10] Large-scale commitments for defense construction of various kinds, financed by the Reconstruction Finance Corporation,[11] were conditioned on the most efficient methods being used, and wartime measures preempted local building codes. Long-term commitments of this type led to expansion of industrial capacity in several fields.[12] This approach permitted requiring steps leading to reduced costs and dealt with the dilemmas of the housing industry by expanding supply and reducing cost.[13]

6. *United States v. Socony Vaccum Oil Co.*, 310 U.S. 150, 226 n. 29, 60 S.Ct. 811, 846 n. 29, 84 L.Ed. 1129 (1940), quoted in *National Society of Professional Engineers v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 1365, 55 L.Ed.2d 637 (1978).

7. By accepting a subsidy and some attendant regulation, one should not be deemed to have waived constitutional rights, under the Fifth Amendment due process clause and the Takings Clause, not to be subjected to involuntary "contracts" not reasonably necessary to effectuate requirements one has agreed to, and not to be subjected to confiscation. See Sullivan, "Unconstitutional Conditions," 102 Harv.L.Rev. 1413 (1989); Van Alstyne, "The Demise of the Right–Privilege Distinction in Constitutional Law," 81 Harv.L.Rev. 1439 (1968).

8. See generally *Legal Strategies for Industrial Innovation* ch. 2 (Shepard's/McGraw–Hill 1982).

9. See generally Rivkin, "Courting Change: Using Litigation to Reform Local Building Codes," 26 Rutgers L.Rev. 774 (1973); it is increasingly thought that public safety may better be protected by performance rather than source or specific material requirements. See 41 U.S.C. § 253a(3); *Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576 (Fed.Cir.1987); *Passavant Corp. v. United States EPA*, 477 F.Supp. 1200, 1204

(D.N.J.1979); N.Y. Laws of 1993, ch. 138, amending State Admin.Proc.Act § 202–a(1).

10. Such housing does not inherently require income limitations for residence if wealthier tenants are unlikely to wish to live there in any event, or if it leads to other desirable housing being vacated. See J. Jacobs, *The Death and Life of Great American Cities* (1961).

11. 47 Stat. 5 (1932), discussed in J. Jones & E. Angly, *Fifty Billion Dollars* (1932) (originally proposed by President Herbert Hoover), utilizing a concept originated through the First Bank of the United States, 1 Stat. 191 (1791), discussed in Hurst, "Alexander Hamilton: Law Maker," 78 Colum.L.Rev. 483 (1978); L. Hacker, *Alexander Hamilton* ch. 8 (1957); see *Soling v. New York*, 804 F.Supp. 532 (S.D.N.Y.1992).

12. This was perhaps most evident in the aluminum industry, see *United States v. Aluminum Corp. of America*, 91 F.Supp. 333 (S.D.N.Y.1950), 153 F.Supp. 132 (S.D.N.Y.1957).

13. See New York Regional Office, Federal Trade Commission, "Staff Report, Public Hearings on Obstacles to Expansion of the Building and Construction Industry" (1973); "Urban Highways," Hearings before the Subcommittee on Roads, Senate Committee on Public Works, 374 (May 6, 1968); Editorial, America magazine, August 17, 1968 at 93; H.R. 1445, 96th Cong., 1st Sess. (1979).

Section 8 takes an entirely different path in seeking to provide housing for lower income families: direct subsidies to the tenants. This has the advantage of not requiring complex bargaining with local authorities, trade unions, various groups of contractors and others in regard to construction methods, siting, standards and similar matters; in part for those reasons it can be effective without delays accompanying creation of new housing.

On the other hand, substantial subsidies to a minute portion of those theoretically eligible create substantial inequities, and the tendency of individual subsidies may be to increase the cost of housing without directly or quickly increasing the supply. Section 8 subsidies, involving current expense payments rather than use of the banking and currency power to promote activities which may pay for themselves (as under § 221), are also vulnerable to budgetary uncertainties.

## VI

In order for the National Housing Act § 221 and the subsequently-created quite different but interrelated § 8 subsidy program to work in tandem under these somewhat difficult conditions, property owners, including those obtaining subsidized mortgages under § 221, must be willing to accept § 8 subsidized tenants. At the same time, rents in dwellings occupied by § 8 tenants must be reasonable and the properties properly maintained, else the monies appropriated under § 8 would be squandered and badly maintained or exorbitant housing would be subsidized. Reconciliation of these twin necessities for § 8 to achieve its congressional objectives is made even more difficult because Congress also saw fit to preclude owners accepting § 8 subsidized tenants from ceasing to do so where the status of a tenant as subsidized under § 8 is the proximate cause

for not accepting that tenant. 42 U.S.C. § 1437f(t).

Such a requirement can only be workable if § 8 contracts are rigidly fixed—a problematic requirement given constant changes in other state, federal and local regulation as well as conditions in the industry—or if property owners can challenge the propriety of new provisions by means other than refusing to sign (and thus ousting § 8 tenants).

Where drastically new requirements are added, an owner may refuse to sign without going through a separate effort to challenge or modify the provision, just as one may at times bypass other normally required avenues for relief where one's right to that relief is sufficiently clear. Summit, however, for years prior to its current refusal, had signed contracts almost identical to the current HUD § 8 contract.

Since acceptance of a § 8 subsidy by an owner recognizes, given § 1437f(t), a relationship carrying an expectation of renewal absent other proximate cause for failure to renew, two requisites among others must be maintained for its purposes to be fulfilled:

1. Private entities receiving either or both kinds of subsidy must be accountable and subject to audit and to reasonable regulation, as contemplated specifically by § 221 and the regulatory agreement under it.

2. Such entities must be immune from unexpected additional bureaucratic burdens not agreed to directly or indirectly in advance,[14] so that private investors are not deterred from pursuing the kind of construction or rentals Congress wishes to promote.[15]

The "bundle of rights"[16] of a subsidized mortgagor under § 221 and an owner receiving indirect subsidies to its tenants for rents under § 8 embraces ability to challenge before HUD (or in the courts where appropriate), the implementation of governmental policy and the reasonableness of contracts

---

**14.** Contracts cannot be amended unilaterally by one party. 4 A. Corbin, *Contracts* § 866 (1951); Restatement, Contracts (Second) § 318(3) (1981); see *Bier Pension Plan Trust v. Estate of Schneierson*, 74 N.Y.2d 312, 545 N.E.2d 1212, 546 N.Y.S.2d 824 (1989).

**15.** See New York State Bar Ass'n, Task Force on Simplification of the Law, Interim Report # 6,

"Agreements to Encourage Investors to Build Residential Housing" (March 1989).

**16.** *Lucas v. South Carolina Coastal Council,* —— U.S. ——, ——, 112 S.Ct. 2886, 2889, 120 L.Ed.2d 798 (1992).

required to be signed upon pain of risking violation of 42 U.S.C. § 1437f(t)(1)(A). Where signature of an agreement is compulsory or refusal to sign has adverse consequences, its execution cannot constitute a waiver of a right to contest the imposition of its compulsory terms; if an order is issued as a result of this litigation requiring Summit to sign the current HUD § 8 agreement, it will explicitly provide that there will be no such waiver, express or implied.

If such a valid objection exists, administrative remedies should be pursued in the first instance. While tenant beneficiaries of subsidies have not been permitted to sue to require HUD to impose additional constraints on landlords because such impositions are discretionary with the agency,[17] this does not indicate that those subjected to sovereign compulsion cannot obtain judicial review under the Administrative Procedure Act or 28 U.S.C. § 1331; to so hold would raise substantial constitutional questions.[18]

## VII

■ Summit argues that Riddick has no standing to challenge Summit's refusal to sign agreements with governmental authorities necessary for her to continue as a § 8 tenant. Summit confuses tenant standing to compel HUD to impose or interpret regulations in their favor under the governing statutes, which the courts have not permitted, with standing to challenge refusals of building owners participating in the § 8 program to grant or extend leases, which has been upheld.

*Glover v. Crestwood Lake Section 1 Holding Corps.*, 746 F.Supp. 301 (S.D.N.Y.1990) held that discrimination against § 8 certificate holders can support a private action. This is logical: either loss of one's ability to retain a place to live, or loss of substantial payments toward one's rent contrary to law, is a deprivation which courts should not assume must be remediless. See *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969) (improper prejudgment garnishment). If governmental action were involved, it might implicate a property right that could not be invaded without due process.

■ By contrast, tenants do not have standing as third party beneficiaries to enforce the provisions of agreements between landlords and governmental authorities. *Reiner v. West Village Associates*, 768 F.2d 31, 33 (2d Cir.1985).

*Reiner*, like other cases denying standing falls into a category of suits by tenants seeking to compel governmental authorities to impose additional requirements upon landlords, to deny relief to landlords, or to provide additional detailed benefits such as electricity cost allowances to tenants. See *Ellis v. United States Dept. of HUD*, 551 F.2d 13 (3d Cir.1977); *Hale v. Chicago Housing Authority*, 642 F.Supp. 1107 (N.D.Ill.1986).

The present case involves not the administration of the housing statutes by government agencies or enforcement of their agreements with landlords, but the ability of the plaintiff to restore her status as a tenant under § 8. Summit agrees that it has no quarrel with Riddick as a tenant and only objects to the text of the agreement demanded by HUD. Riddick's suit does not seek intrusion into the current ongoing operations of government agencies or, indeed, of Summit. Summit has already signed similar agreements to that it is now asked to sign, and its rights to challenge the agreement or its interpretation before or against HUD will be preserved.

Denying standing in the *Reiner* line of cases leaves enforcement of rights created by HUD against landlords in the hands of governmental agencies as intended by Congress.

---

**17.** *Hahn v. Gottlieb*, 430 F.2d 1243 (1st Cir. 1970); *Frakes v. Pierce*, 700 F.2d 501 (9th Cir. 1983).

**18.** See *Webster v. Doe*, 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988); *Lindahl v. OPM*, 470 U.S. 768, 105 S.Ct. 1620, 84 L.Ed.2d 674 (1985); *Adamo Wrecking Co. v. United States*, 434 U.S. 275, 98 S.Ct. 566, 54 L.Ed.2d 538 (1978); *Leedom v. Kyne*, 358 U.S. 184, 189–90, 79 S.Ct. 180, 184–85, 3 L.Ed.2d 210 (1958); *Philadelphia v. Stimson*, 223 U.S. 605, 619–20, (1912); *Bartlett v. Bowen*, 816 F.2d 695 (D.C.Cir.), *reinstated* 824 F.2d 1240 (D.C.Cir.1987); *Marozsan v. United States*, 852 F.2d 1469, 1477–80 (7th Cir.1988) (en banc).

Permitting standing to a tenant such as Riddick directly injured by discrimination in violation of a provision intended for her protection, is not dependent on agreements with HUD and, by contrast, in accord with the intent Congress must have had to make the antidiscrimination provision effective. See *Cort·v. Ash*, 422 U.S. 66, 76–78, 95 S.Ct. 2080, 2086–2088, 45 L.Ed.2d 26 (1975), reaffirmed in *Thompson v. Thompson*, 484 U.S. 174, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988).[19]

## VIII

Summit's real quarrel is not with Riddick, who holds a Section 8 certificate and has long been a tenant in the building, but with the terms of the contract insisted upon by the HUD, which defendants claim goes beyond permissible restrictions upon defendants' management of the building. Riddick should not be held hostage because of a broader disagreement between Summit and HUD.

It would run contrary to the objectives of housing legislation and those set forth in Fed.R.Civ.P. 1[20] for Riddick to be dragged into a regulatory controversy which she did not originate, and thus become an involuntary pawn in that dispute. Riddick is not seeking any additional rights. For her to lose her § 8 subsidy and perhaps be put onto the street because of disagreements between Summit, an institutional entity, and HUD, an even larger such entity, would constitute a failure of the legal system and a miscarriage of justice.

Summit's remedy is not to refuse to sign documents and thus to terminate Riddick's tenancy, but to raise with HUD the propriety of its current § 8 contract and its implementation; if necessary Summit may seek judicial review of HUD's position. As indicated above such review appears to be available; Summit will not be estopped from raising such issues with or against HUD by reason of a settlement or order in the current case, and I have the power to retain jurisdiction to reopen the current issues if such review is properly sought but refused.[21]

I direct the parties to consider an agreement, more fully described below, reinstating Riddick's § 8 status while preserving Summit's rights to contest HUD's current § 8 contract through all available avenues including addition of HUD as a third party defendant in this litigation. The advantage of such an agreement is that it will permit the present Riddick–Summit dispute (incidental to Summit but crucial to Riddick) to be resolved, while preserving Summit's ability to contest HUD requirements or their implementation without having waived any of its objections to them.

## IX

The agreement the parties are directed to consider may include provisions, to be incorporated into an order of this court, authorizing Summit to execute documents required to permit Riddick to occupy Summit housing as a Section 8 tenant under current HUD requirements without prejudice to Summit's right to challenge the propriety or implementation of such requirements, and without

---

**19.** Legislative history, although not independently binding, supports denial of standing in the *Reiner* situation involving tenant suits to enforce HUD–landlord agreements, but granting of standing where a lease is denied to a § 8 tenant. Private suits were considered but omitted from the 1974 legislation involved in *Reiner*, as discussed in that case, 768 F.2d at 33. Such were, by contrast, contemplated by H.Rep. 100–22(I), 1987 U.S.Code Cong. & Admin. News 3369, quoted in *Glover v. Crestwood Lake Section 1 Holding Corps.*, 746 F.Supp. 301, 309 (S.D.N.Y. 1990):

"... The Committee intends ... that applicants and tenants who are adversely affected by violations of [§ 1437f(t)] should have a cause of action to enforce the statute in federal court."

**20.** "These rules ... shall be construed to secure the just, speedy and inexpensive determination of every action."

**21.** It is not necessary to consider at this time to what extent Summit must exhaust administrative remedies before challenging HUD's authority to promulgate certain provisions of its current § 8 agreement, or controverted aspects of implementation of the agreement. See *Darby v. Cisneros*, — U.S. ——, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993). Nor is it necessary to consider now to what extent courts should defer to HUD interpretations of statutes it administers. See Oakes, 'Plain Meaning,' 'Original Intent,' 'Administrative Deference': Judicial Abdication or Judicial Activism?, 47 Record of The Ass'n of the Bar of the City of New York 772 (Nov.1992).

Summit's signature constituting a waiver of any such challenge.[22]

Such an agreement may provide for dismissal of the current litigation in this court upon reinstatement of Riddick's tenancy under § 8, without prejudice to revival of this suit by either party if necessary. Such revival might be authorized should Summit wish to seek to join HUD as a party to this action while retaining Riddick as a Section 8 tenant, in the event that after proper efforts are made, no other remedy is available to Summit to pursue its contentions regarding the HUD Section 8 contract.

## X

In the event no agreement along the above or other lines between the parties can be negotiated, I will consider granting relief directing defendants to execute any documents required to reinstate and continue plaintiff's status as a subsidized tenant under § 8 without prejudice to defendants' rights to challenge the applicable requirements in submissions to or litigation with the relevant governmental agencies. Such relief if ordered will provide that neither such order nor defendants' involuntary signature of documents would constitute a waiver of or estoppel against defendants' claims that the documents are improperly required on their face or as applied or are otherwise contrary to law.

## XI

■ Summit's position appears to be that it is Riddick's responsibility under Fed. R.Civ.P. 19(a) to have added HUD or local housing authorities as parties if necessary to complete adjudication. Presence of HUD or other governmental agencies as parties appears necessary to granting the relief sought by Summit, not that sought by Riddick. Summit as a defendant cannot insist that a plaintiff sue every party who might be necessary to adjudication of the defendant's contentions. See *Humphrey v. Stanolind Oil & Gas Co.*, 232 F.2d 925 (5th Cir.1956).

I grant permission for Summit to add appropriate governmental bodies as third party defendants if they can properly be joined, should it wish to do so rather than pursue through other avenues its claims that current § 8 requirements as adopted or implemented are improper. I do not prejudge what exhaustion of administrative remedies or other prerequisites may be necessary for Summit to pursue such claims.

Joinder of governmental agencies will not necessarily require delay of my consideration of relief to Riddick. As set forth previously, Summit can be required to sign the necessary documents to reinstate Riddick's § 8 subsidy without prejudice to Summit's position with respect to the validity of the requirements set forth in those documents.

## XII

■ Riddick has sought punitive damages. Summit has the right to contest what it considers unauthorized governmental encroachment upon its managerial functions and corporate independence. I find no basis for inferring intentional wrongdoing which would support plaintiff's application for punitive damages.

Plaintiff has also sought an award of attorney's fees; such application may be renewed upon disposition of the case if supported by authority for such an award. See *Holbrook v. Pitt*, 748 F.2d 1168 (7th Cir.1984).

■ The individual defendants in this case like others with notice (Fed.R.Civ.P. 65) will be bound by any injunctive decree directing Summit to take steps requiring action on their part. There is no basis for holding them liable individually for damages or attorney's fees.

Suit against individual defendants with respect to monetary claims where a solvent organization is the actor, and where as here complete relief can be obtained without pursuing natural persons as defendants, serves no purpose and is contrary to the objectives

---

**22.** While such an order is not independently binding on HUD as a non-party (unless added by Summit which I permit Summit to do), it defines the significance of the document issued pursuant to the order. See generally Fed.R.Civ.P. 70; *In re Anthony Sicari, Inc.*, 151 B.R. 60 (S.D.N.Y. 1993).

**146**

of Fed.R.Civ.P. 1 and the Judicial Improvements Act of 1990, Public Law 101–650, 104 Stat. 5089, enacting 28 U.S.C. § 473. See *Archer v. Globe Motorists Supply Co.*, 833 F.Supp. 211 (S.D.N.Y.1993).

No reason for piercing the corporate veil has been presented. See 1 Fletcher, *Cyclopedia of Corporations* § 44, 44.1 (rev. perm. ed 1983); Gelb, "Piercing the Corporate Veil—the Undercapitalization Factor," 59 Chi.–Kent L.Rev. 1 (1982).

## XIII

■ Summit asserts that Riddick's legal aid counsel violated DR 7–104 by communicating with Summit personnel prior to initiation of the lawsuit when they should have known that Summit had counsel. This case, however, is before me on agreed facts, concededly genuine documents and legal arguments submitted by the parties. Hence such ethical infractions, if they occurred, would have no bearing on the litigation before me and cannot be considered in connection with it. Moreover, legal ethics are pragmatic and to be applied where real, not speculative harm is involved. See *United States v. Thompson*, 803 F.Supp. 905 (S.D.N.Y.1992); *United States v. Bryser*, 803 F.Supp. 908 (S.D.N.Y.1992).

Moreover, if counsel for Summit had not been involved in the matter when the communications occurred, there could also be no ethical violation, especially if no litigation was pending. See *In re FMC Corp.*, 430 F.Supp. 1108 (D.W.Va.1977).

Where an organization rather than a natural person is the recipient of questions or communications by opposing counsel, in connection with ongoing relationships, and questions asked could equally well be put by the

client in the course of that activity, no overreaching appears likely, and the objectives of the Rule would not apply.[23]

## XIV

■ Riddick's request for sanctions under Fed.R.Civ.P. 11 is likewise out of place. Summit's counsel made no factual misstatements: it appears conceded that Riddick's counsel did indeed talk with Summit personnel prior to the bringing of the lawsuit. Paradoxically, perhaps, Riddick's counsel have defended this as necessary or proper inquiry to avoid Fed.R.Civ.P. 11 sanctions.

Summit and its counsel might, even if erroneously, have been concerned that legal ethics had been violated.[24] They raised the issue without making groundless factual assertions.[25] Under such circumstances, Fed.R.Civ.P. 11 sanctions are inappropriate. See *Stern v. Leucadia National Corp.*, 844 F.2d 997, 1005–06 (2d Cir.), *cert. denied* 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 109 (1988).

To penalize Summit for raising the issue would have a chilling effect on the constitutionally protected access to the courts. See *Bates v. Arizona*, 433 U.S. 350, 376 n. 32, 97 S.Ct. 2691, 2705 n. 32, 53 L.Ed.2d 810 (1977); *United Transportation Union v. State Bar of Michigan*, 401 U.S. 576, 91 S.Ct. 1076, 28 L.Ed.2d 339 (1971); *Brotherhood of Railway Trainmen v. Virginia*, 377 U.S. 1, 84 S.Ct. 1113, 12 L.Ed.2d 89 (1964); *Bounds v. Smith*, 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977).

Were it sanctionable to make difficult uphill arguments contrary to existing authority, many landmark decisions would have been reached only at the peril of those arguing for them.[26] Indeed, counsel for less well-funded

---

**23.** The situation in such circumstances is akin to that where a governmental agency is involved. See C. Wolfram, *Modern Legal Ethics* 614–15 (1986); ABA Model Rule 4.2, comment; Ass'n Bar City NY 1988–8; Ass'n Bar City NY 1991–4 (governmental counsel if already specifically known should be contacted first); Note, 61 Minn.L.Rev. 1007, 1033 (1977).

**24.** See generally, e.g., *Niesig v. Team I*, 76 N.Y.2d 363, 558 N.E.2d 1030, 559 N.Y.S.2d 493 (1990); Sinaiko, "Ex Parte Communication and the Cor-

porate Adversary," 66 N.Y.U.L.Rev. 1456 (Nov. 1991).

**25.** *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990).

**26.** See, e.g., *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (one person–one vote decision); *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954); *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), overruling *Minersville School District v. Gobitis*,

parties such as Riddick might be the most likely to suffer if sanctions were imposed or expensive, time-consuming side litigation over sanctions were generated in this type of situation. See Taft, "The Delays of the Law," 18 Yale L.J. 28, 35 (1908).

## XV

Important questions involving the administration of the § 8 subsidy program and its interaction with § 221 are raised by contentions of the parties in this case and discussed in this memorandum order; I direct plaintiff's counsel to send copies of this memorandum order to the relevant local housing agencies, the Regional Director and Secretary of the Department of Housing and Urban Development, and the chairs of the relevant House and Senate Committees.

SO ORDERED.

310 U.S. 586, 60 S.Ct. 1010, 84 L.Ed. 1375 (1940) (upholding compulsory flag salute with sanctions for nonparticipating children by vote of 8–1 over dissent of Justice Stone).